UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

REGENA ROBINSON,

        Plaintiff,

v.                                    Case No. 2:15-CV-62

SINCLAIR BROADCASTING GROUP,      HON. GORDON J. QUIST
INC., and CHESAPEAKE MEDIA I, LLC,

        Defendants.

_____/

## **OPINION**

Plaintiff, Regena Robinson, is an African-American woman who was previously the news director for WLUC, a television station in Michigan's Upper Peninsula.  During the majority of Robinson's tenure at WLUC, the station was owned by Barrington Broadcasting, LLC (Barrington), which is not a party to this action.  In February 2013, Defendant Sinclair Broadcasting Group (SBG) entered into an asset purchase agreement for WLUC and closed the agreement in November 2013. In January 2014, Robinson complained to SBG management that she had been subject to harassment based on her race and gender.  Robinson delivered many documents to SBG, but two days later, Robinson resigned.  Robinson has sued SBG and its subsidiary, Chesapeake Media, LLC (Chesapeake), which is the holding company for WLUC, alleging that she was subject to a hostile work environment based on her race and gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2101 *et seq.*

Defendants have moved for summary judgment.  On April 18, 2016, this Court heard oral argument.  For the reasons stated in this Opinion, this Court grants the motion.

### *Background*

The facts are set forth in the light most favorable to Robinson.

On August 8, 2011, Robinson began working as the news director for WLUC, a television station in the Upper Peninsula owned by Barrington.  (ECF No. 36-3 at Page ID.150-52.)  At that time, and throughout her tenure at WLUC, Robert Jamros was the station's general manager and Robinson's supervisor.  (ECF No. 36-5 at Page ID.356; ECF No. 36-3 at Page ID.152.)  As the news director, Robinson supervised a staff of approximately 20 employees.  (ECF No. 36-3 at Page ID.152.)

Robinson's second-in-command was Steve Asplund, the assistant news director.  (ECF No. 38-34 at Page ID.958.)  On Robinson's first day of work, Asplund told Robinson that she should enter through the back door so that her staff could see her when she arrived.  (ECF No. 38-2 at Page ID.522; ECF No. 38-32 at Page ID.960.)  Robinson reported Asplund's statement to Jamros, who told her to be a team player and walk through the back door.  (ECF No. 38-2 at Page ID.523.)

Shortly after Robinson began working at WLUC, someone began entering her office when she was not there and taking photographs and other items from the office.  (ECF No. 38-3 at Page ID.547-48.)  Sometime in late 2011,  Robinson told Jamros about the issue, and Jamros initially did nothing about it.  (*Id.*)  In October 2012, however, after someone drained the water out of flowers in Robinson's office, Jamros agreed to change the locks in Robinson's office.  (*Id.*)

During Robinson's tenure at WLUC, Jamros made several comments to her that alluded to race.  On one occasion, Jamros said that Robinson had an Afro.  (ECF No. 38-2 at Page ID.531.)  On another occasion, Jamros told Robinson that "you all with dark skin look the same."  (*Id.*)  Jamros once told a news consultant that Robinson did not look like a news director, and that the previous director looked like the news consultant (who was a white male).  (*Id.*)  Finally, Jamros

2

once told Robinson that she only looked at the same ethnic group when hiring positions.  (*Id.* at Page ID.532.)

During 2012 and 2013, there was consistent conflict between Robinson and Jamros.

- On April 24, 2012, Robinson told Barrington's human resources department that she was being mistreated by Jamros based on her race and gender.   (ECF No. 38-20 at Page ID.860; ECF No. 38-2 at Page ID.529.)

- On April 25, 2012, Jamros interviewed members of Robinson's staff because it appeared that there was a lack of harmony within the news department.  (ECF No. 38-23 at Page ID.923.)   After completing those interviews, Jamros met with Robinson and completed an interim performance comment form (IPCF) for Robinson's file criticizing Robinson's leadership.  (*Id.*)

- On May 2, 2012, Jamros met with Robinson and several of her senior staff members.  (ECF No. 36-11 at Page ID.392.) Following that meeting, Jamros told Robinson that she had to improve her management.  (*Id.*)

- In August 2012, Robinson complained to Barrington's senior management that her predecessor, who was supposed to stay in the newsroom for a one-month transition period after Robinson took over, was still in the newsroom one year later.  (ECF No. 38-2 at Page ID.553-54.)

- In August 2012, Jamros interviewed Robinson's staff and met with Robinson about her management problems.  (ECF NO. 38-36 at Page ID.1006.)  He completed an IPCF documenting that meeting.  (*Id.*)

- On January 15, 2013, Jamros filed an IPCF stating that Robinson was insubordinate in a staff meeting, and that he had told her that he would fire her if she ever did it

again.  (ECF No. 38-38 at Page ID.1011.)

- On February 4, 2013, Robinson complained to Barrington's human resources department that Jamros and Asplund were mistreating her because she was an African-American woman.  Shortly thereafter, Robinson voiced the same complaint to Barrington's President, Chris Cornelius.  (ECF No. 38-17 at Page ID.840.) Cornelius held a meeting with Jamros and Asplund, and later changed Asplund's schedule so that he worked at different times than Robinson.  (ECF No. 38-3 at Page ID.634.)

- In September 2013, Jamros reversed the change to Asplund's schedule in spite of Robinson's protests.  Jamros told Robinson to stop being so emotional.  (ECF No.38-17 at Page ID.842.)

On February 28, 2013, Sinclair Television Group (STG), a wholly owned subsidiary of SBG, entered into an asset purchase agreement to purchase WLUC assets from Barrington.  (ECF No. 38-8.)  The contract provided that STG would assume certain liabilities related to employees, but STG did not generally assume liabilities related to employment disputes.  (*Id.*; ECF No. 36-2 at Page ID.143.)  On March 11, 2013, SBG created Chesapeake to serve as a holding company for WLUC. (*Id.*)  On November 22, 2013, STG took over operation of WLUC.  (ECF No. 36-2 at Page ID.143.) The takeover did not substantially affect WLUC's business, and most employees maintained their positions and duties.  (*Id.*)

In December 2013, Jamros completed an IPCF stating that Robinson had put a segment on the news against Jamros's instruction.  (ECF No. 38-42 at Page ID.1024.)  Later that month, Jamros raised concerns about Robinson with SBG's human resources director, Allison Kiniry, and SBG's regional manager, Chris Manson.  (ECF No. 38-3 at Page ID.639.)  On January 2, 2013, Asplund submitted a form through SBG's intranet site calling into question Robinson's leadership. (ECF No.

38-46 at Page ID.1035.)

On January 7, 2014, Kiniry and Manson held a phone call with Robinson and Jamros to discuss Robinson's performance. (ECF No. 38-3 at Page ID.639.) During that call, Robinson complained that she had been harassed based on her race and gender and that she was in the process of putting together an EEOC complaint. (ECF No. 38-21 at Page ID.867.) Robinson told Kiniry that she was uncomfortable meeting with Jamros alone, and Kiniry responded that Robinson and Jamros should not meet without a human resources representative present. (*Id.* at Page ID.871.)

Although she did not discuss it during the phone call, Robinson had received an anonymous letter earlier that morning that made hateful and threatening remarks based on Robinson's race and gender. (ECF No. 38-21 at Page ID.871-72.) Two other WLUC employees received similar letters. (*Id.*) Robinson did not know who sent letter. (*Id.*)

The day after the January 7, 2014 meeting, Jamros walked into Robinson's office and asked to discuss the previous day's call. (ECF No. 38-21 at Page ID.878-79.) Robinson told Jamros that they were not supposed to meet without a human resources representative present. (*Id.*) Jamros did not immediately leave Robinson's office, however, so Robinson left. (*Id.*) During the remainder of that day and the following day, Robinson sent Kiniry and Manson several emails notifying them that Jamros had come into her office and attempting to support her allegations of harassment. (ECF No. 36-20 at Page ID.421-22; ECF No. 36-21 at Page ID.424-27.)

On January 10, 2014, Robinson resigned from WLUC by letter. (ECF No. 38-50 at Page ID.1049.) Although Robinson said that she would stay until January 30, Kiniry told Robinson that it would be best if she did not work after January 10 (although she was paid through January 30). (*Id.*) Following Robinson's resignation, Kiniry conducted an investigation of Robinson's allegations and concluded that they were unsubstantiated. (ECF No. 38-51 at Page ID.1051-53.)

5

### *Legal Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### *Discussion*

A plaintiff alleging a hostile work environment claim under Title VII or ELCRA must demonstrate that "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (noting that ELCRA's hostile work environment analysis is identical to Title VII's).

Only harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment" is actionable under Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an

6

environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Courts look to all the circumstances in determining whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.*" Harris*, 510 U.S. at 23, 114 S. Ct. at 371. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788, 118 S. Ct. at 2283 (internal citation and quotation marks omitted).

In determining whether a working environment is abusive, courts consider harassment "by all perpetrators combined," but limited to that which is based on the plaintiff's race. *Williams*, 643 F.3d at 511. "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.*

1. Successor Liability

Defendants argue that they cannot be held liable for anything that occurred before they took over operations of WLUC in November 2013. Robinson did not respond to Defendants' argument, except to state that WLUC is a separate entity that can be held liable. During oral argument, despite repeated questioning from the Court, Robinson failed to assert any facts showing that either Defendant had any knowledge of WLUC's alleged harassment of Robinson. Robinson relies solely upon the fact that the asset purchase agreement was signed in February 2013. As the allegations of

Robinson's complaint make clear, WLUC is not a separate legal entity and Robinson did not sue WLUC as a separate legal entity. Rather, Robinson sued Chesapeake (an SBG subsidiary) d/b/a WLUC.

So, the question then becomes—Are Defendants liable for allegedly wrongful harassment perpetuated by Barrington? The Court concludes that the answer is no.

In *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir.1974), the Sixth Circuit held that successor employers may be held liable in Title VII cases based on equitable considerations. The court listed nine factors, which essentially boil down to three factors: (1) whether there is substantial continuity of business operations, (2) whether the successor employer had notice of the predecessor's legal obligation, and (3) the ability of the predecessor to provide adequate relief. *See id.*

Subsequently, however, the Sixth Circuit limited the applicability of the *MacMillan* balancing test. *Wiggins v. Spector Freight Sys., Inc.*, 583 F.2d 882, 886 (6th Cir.1978). In *Wiggins*, the court held that a successor employer may *not* be held liable if (1) charges were not filed with the EEOC at the time of the acquisition and (2) the successor corporation had no notice of any claim of discrimination at the time of the acquisition. *Id.* *Wiggins* expressly held that where these two conditions exist, a case is "remove[d] ... from the rationale" of *MacMillan* and successor liability does not attach. *Id.* The Sixth Circuit reaffirmed that holding in *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir. 1986), overruled on other grounds by *Harris* , 510 U.S. 17, 114 S.Ct. 367, which concluded that a successor employer could not be held liable for harassment that occurred prior to its acquisition of the original employer. *Id.* at 616. The Michigan Supreme Court has also adopted the *Wiggins* limitation to successor liability in ELCRA cases. *Stevens v. McLouth Steel Prods. Corp.*, 433 Mich. 365, 373-75, 446 N.W.2d 95, 99-100 (1989).

8

In this case, Robinson did not file a charge with the EEOC until after SBG took over WLUC. Moreover, Defendants have provided an affidavit stating that they had no notice of any potential claims by Robinson. Robinson disputes that assertion, stating that she had informed Barrington's human resources department of the alleged harassment. Because those employees worked for Barrington until November 2013, however, informing them would not give notice to SBG or its subsidiaries. The Court gave Robinson ample opportunity to point to evidence that either Defendant had notice of any kind, and she failed to do so.

2.    Robinson's Evidence of Harassment:

Robinson lists a number of incidents that she alleges constituted harassment. These incidents can be summarized as follows:

- Jamros made four separate remarks that Robinson alleges were racial in nature: Robinson had an Afro; all dark skinned people look the same; Robinson did not look like a news director; and Robinson looked only at the same ethnic group in hiring.

- Someone broke into Robinson's office for a year before the locks were changed.

- Jamros kept the previous news director on staff for a year after Robinson started.

- Robinson's subordinates mocked her and criticized her. She does not allege facts showing that this mockery and criticism was because of her race or gender.

- Jamros criticized Robinson's performance, submitted IPCFs about her, and rejected her proposals.

- Jamros interviewed Robinson's staff about her performance.

- Jamros told Robinson to stop being so emotional.

- Jamros intimidated Robinson during the January 7, 2014 phone call.

- Jamros went into Robinson's office and attended her morning meetings after the

January 7, 2014 phone call.

•     Someone sent Robinson racist letters at work and WLUC staff acted like they thought Robinson sent them herself.

Almost all of the alleged incidents occurred before SBG took over WLUC in November 2013.  The incidents that Robinson identifies that occurred after November 2013 concern Jamros's complaints to SBG in late 2013, the January 7, 2014 phone call to discuss those concerns, the interactions between Jamros and Robinson after the call, and the threatening letter.

Robinson's receipt of the letter would likely be sufficient to sustain a hostile work environment claim if she could demonstrate that Jamros (or someone else at WLUC) sent it to her. However, Robinson has no evidence that anyone affiliated with WLUC sent the letter.  In a similar case, the Sixth Circuit rejected a plaintiff's argument that her hostile work environment claim was supported by evidence that her car was vandalized, pointing out that there was no evidence that the defendant's employees were the vandals.  *Williams*, 643 F.3d at 511.  Similarly, because Robinson has no evidence that Defendants' employees sent her the letter, she cannot use the letter to support her hostile work environment claim.  Moreover, Robinson has failed to show that Defendant's reaction to the letter constituted harassment.

A reasonable jury could not conclude that the other identified incidents that occurred after November 2013 constitute harassment sufficiently severe or pervasive to alter the conditions of employment.   *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) ("Although the question of whether conduct is severe or pervasive is quintessentially a question of fact, [the Sixth Circuit] ha[s] . . . affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive.") (internal quotation marks and citation omitted).  Robinson complains that Jamros unjustly criticized her performance, and that he came into her office and attended her morning meetings in an attempt to make her feel

uncomfortable.  The factors identified by the Sixth Circuit do not indicate that such actions rose to the level of actionable harassment.  Jamros's conduct was not frequent or severe—he made two complaints about Robinson after SBG took over, had one telephone call to discuss those complaints, came into her office once, and sat in on, at most, two morning meetings.  Moreover, although Robinson suggests that such conduct was threatening and humiliating, it was not objectively so. Finally, Robinson has testified that she was able to go about completing her work in the face of Jamros's actions.

Robinson would fare no better even if the Court were to consider the alleged incidents preceding SBG's takeover of WLUC in November 2013.  Assuming that Jamros's comments touching on Robinson's race were insensitive, those comments were "occasional offensive utterances [that] do not rise to the level required to create a hostile work environment."  *Williams*, 643 F.3d at 512.  To hold otherwise would, in this Court's judgment, tend to make any workplace comment regarding race grounds for a Title VII suit.  *Williams*, 643 F.3d at 512.  *See also Clay*, 501 F.3d at 708 (noting that "mere offensive utterances" are not actionable under Title VII).  The four comments—made over a three-year period—were less offensive than some the Sixth Circuit has found were insufficient to constitute actionable harassment.  For instance, in *Williams*, the plaintiff alleged that the defendant's employees called Jesse Jackson and Al Sharpton "monkeys" and said that black people should go back to where they came from.  643 F.3d at 513.  The court found that the comments, although bigoted and insensitive, "more closely resemble a mere offensive utterance than conduct that is physically threatening or humiliating."  *Id.* (internal quotation marks omitted). Thus, the court held that the racists statements were not sufficient to create a jury question on the plaintiff's hostile work environment claim.  *Id.*

The Sixth Circuit has also repeatedly held that a plaintiff cannot state a hostile work

11

environment claim based on employer criticism. *See Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323 (6th Cir. 2012); *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005). In *Plautz*, the court rejected the plaintiff's hostile work environment claim because most of the allegations were examples of the plaintiff's superiors discussing performance-related problems. *Plautz*, 156 F. App'x at 819. The court explained that "[c]onversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress." *Id.* (internal quotation marks omitted). Similarly, in *Hale*, the plaintiff asserted a hostile work environment claim based primarily on a spate of emails his manager sent criticizing the plaintiff's performance. The court rejected the plaintiff's argument, explaining:

> This conduct simply does not rise to the level of severity or frequency required to sustain a hostile work environment claim. While such criticisms certainly may have been frustrating and discouraging, they were part of the ordinary tribulations of the workplace that do not amount to the sort of extreme conduct required to effect a change in the terms and conditions of employment. [The plaintiff] has thus failed to show an objectively intimidating, hostile, or offensive work environment.

*Id.* at 338 (internal citations and quotation marks omitted).

Finally, to the extent that Robinson's claims are based on her subordinates mocking her or disrespecting her, there is no evidence that such conduct was based on race. There is no allegation that the subordinates that Robinson cites as mocking her ever mentioned her race. Moreover, Robinson's argument that she once overheard a reporter say that Asplund treated her poorly because she was black appears to be based on speculation and is, in any event, inadmissible hearsay. Accordingly, any incidents involving Robinson's subordinates could not be used to support Robinson's hostile work environment claims. *See Williams*, 643 F.3d at 511 (noting that while courts consider harassment "by all perpetrators combined," such consideration is limited to harassment based on the plaintiff's race).

In summary, Robinson does not show that she faced harassment that was so severe or pervasive as to alter the conditions of her employment and create an abusive working environment, even if the Court considers the entirety of Robinson's tenure at WLUC.  Aside from four remarks that she found offensive, she has pointed only to criticism based on her work performance.  While such criticism may have caused Robinson distress, it was part of the "ordinary tribulations of the workplace," and not the sort of "extreme" conduct necessary to maintain a hostile work environment claim.  *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284.  To find otherwise would turn Title VII into a "general civility code," as the Supreme Court has repeatedly warned against.  *See id.* at 788, 118 S. Ct. at 2283-84.

3.    Affirmative Defenses

The parties argue about whether Robinson's resignation constituted a constructive discharge. Because Robinson's prima facie case for hostile work environment fails, the Court need not decide whether Defendants can assert an affirmative defense.

### *Summary and Conclusion*

The Court grants Defendants' motion for summary judgment because Robinson cannot demonstrate that she was subject to harassment that was so severe or pervasive as to alter the conditions of her employment and create an abusive working environment.  The great majority of the encounters that Robinson cites in support of her claim occurred before November 2013, when Defendants to took over operation of WLUC.  Because Robinson had not filed an EEOC claim before that time, and Defendants had no notice of a potential claim, they are not liable for any harassment that occurred before November 2013.  Even if Defendants were liable for events that transpired before 2013, however, the incidents that Robinson cites are simply part of the ordinary

tribulations of a workplace, and are not sufficient to sustain a claim under Title VII or ELCRA.

An order consistent with this Opinion shall issue.


Dated:  April 22, 2016                        _____/s/ Gordon J. Quist_____
                                              GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE